# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DEREK M. ROGERS,**

        **Plaintiff,**

    **v.**
                                     **Civil Action 2:18-cv-129**
                                       **Chief Judge Edmund A. Sargus, Jr.**
                                       **Magistrate Judge Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Derek M. Rogers, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his Supplemental Security Income and Disability Insurance Benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

### A.  Prior Proceedings

Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") in September 2014, alleging disability due to a number of physical and mental impairments. (Doc. 7-5, Tr. 261, PAGEID #: 304). Plaintiff alleged an onset date of February 15, 2012. (*Id.*).

After initial administrative denials of Plaintiff's claims, Administrative Law Judge Jeffrey Hartranft ("the ALJ") heard the case on January 25, 2017. (*Id.*, Tr. 72–117, PAGEID #: 112–57).

On March 22, 2017, the ALJ issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Doc. 7-3, Tr. 13–35, PAGEID #: 53–75). Plaintiff requested a review of the Hearing and the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Doc. 7-2, Tr. 1–4, PAGEID #: 41–44).

Plaintiff filed this case on February 16, 2018, and the Commissioner filed the Administrative Record on May 15, 2018. (Doc. 7). Plaintiff filed a Statement of Specific Errors on July 9, 2018 (Doc. 10), the Commissioner responded on August 22, 2018 (Doc. 11), and Plaintiff field a Reply (Doc. 12). Thus, this matter is now ripe for review.

**B. Relevant Hearing Testimony**

At the hearing, Plaintiff testified that his "back is always constantly spasming" and that he cannot stand for long periods of time because his legs "start tingling." (Doc. 7-2, Tr. 89, PAGEID #: 129). He stated that he can sit for only 10-15 minutes at a time and can stand for only 10-15 minutes at a time. (*Id*., Tr. 90, PAGEID #: 130). He also testified, however, that he can walk for a half-hour without pain. (*Id*.). Further, Plaintiff stated that he can lift, at most, five pounds without aggravating his back. (*Id*.). When asked about his reduced vision, Plaintiff testified that "it's like I'm really legally blind . . . in my right eye." (*Id*., Tr. 90–91, PAGEID #: 130–31). He explained that he wears a contact lens in his left eye to assist with his vision. (*Id*., Tr. 91, PAGEID #: 131). He also testified that while he can drive, he prefers not to because of his vision.

Next, the ALJ asked Plaintiff about any issues with his left shoulder:

> Q. . . . the left shoulder, problems with your left shoulder?
> A. No.
> Q. No? At one time did you have problems with your left shoulder?
> A. Yeah, I did.
> Q. Okay.
> A. I had problems with it, and they kind of corrected that with a cortisone shot.
> Q. Okay. So that's resolved?

A. Yes.
Q. Okay.

(*Id*., Tr. 92–93, PAGEID #: 132–33).

Plaintiff then provided testimony about his HIV diagnosis.  (*Id*., Tr. 93, PAGEID #: 133).

He stated that his HIV diagnosis is fairly well-controlled with medication, but that he believes he

is becoming resistant to his medication.  (*Id*., Tr. 94–95, PAGEID #: 134–35).  Finally, Plaintiff

testified about his issues with depression.  (*Id*., Tr. 94, PAGEID #: 134).  He stated that he does

not like to be around other people and that he often feels suicidal.  (*Id*., Tr. 95, PAGEID #: 135).

He explained that he is not motivated, has difficulty concentrating, and experiences problems

focusing.  (*Id*., Tr. 96, PAGEID #: 136).  In response to his attorney's questioning, Plaintiff

testified that he experiences frequent "crying spells."  (*Id*., Tr. 103–04, PAGEID #: 143–44).

As to his work history, Plaintiff testified that he last worked as a commercial office cleaner

in 2011, where he cleaned windows, vacuumed, and emptied the garbage.  (*Id*., Tr. 80–81,

PAGEID #: 120–21).  Before that, he worked at Sibley Medical as an officer manager, where he

was responsible for managing two other people.  (*Id*., Tr. 82, PAGEID #: 122).  His job

responsibilities there included packaging and delivering medical supplies.  (*Id*., Tr. 82–83,

PAGEID #: 122–23).  Plaintiff testified that he could lift a five-to-ten-pound box while working

at Sibley Medical.  (*Id*.).  Prior to that, Plaintiff worked as a medical records specialist at a doctor's

office, where he had to stand for most of the day.  (*Id*., Tr. 84, PAGEID #: 124).  He also previously

worked as a special police officer, a security guard, a baggage screener at the airport, and as a

flight attendant for American Airlines.  (*Id*., Tr. 85–87, PAGEID #: 125–27).

With regard to his daily activities, Plaintiff testified that he lives with his mother and that

the two "assist" one another.  (*Id*., Tr. 79, PAGEID #: 119).  When asked how he spends a typical

day, Plaintiff responded that he does "little daily stuff," naps, "do[es] a few things in the house, or

[] might wash some clothes," but that he does not have a social life. (*Id*., Tr. 97–98, PAGEID #: 137–38). He explained that his mom does the majority of the cooking; that he does her laundry because he lives in the basement, where the washing machine is located; and that he is able to do some vacuuming. (*Id*., Tr. 101, PAGEID #: 141). He repeated that his "biggest thing" is his back because it "limit[s] [him] to a good way of life because [he is] always in constant pain with [his] back." (*Id*., Tr. 98, PAGEID #: 138). Plaintiff testified that he believes his back pain intensified after having surgery. (*Id*., Tr. 103, PAGEID #: 143). In response to his attorney's questioning, Plaintiff stated that he has difficulty sleeping because of his back and takes naps during the day to catch up on sleep. (*Id*., Tr. 98–99, PAGEID #: 138–39).

During the hearing, a vocational expert ("VE") opined that Plaintiff could perform his past work as a commercial cleaner as he actually performed it, and, alternatively, that he could also perform the light and unskilled positions of label coder, routing clerk, and tacking machine tender. (*Id*., Tr. 107–08, PAGEID #: 147–48).

### C. Relevant Medical Background

Plaintiff was diagnosed with HIV at age 17. (Doc. 7-7, Tr. 339, PAGEID #: 384). He takes prescribed HIV medications and has reported success with those medications. (*Id*., Tr. 402, PAGEID #: 447). Indeed, Plaintiff's records indicate that his HIV diagnosis is "well controlled" and stable with mostly undetectable viral loads. (*Id*., Tr. 468, PAGEID #: 513; Doc. 7-8, Tr. 793–94, PAGEID #: 839–40). In 2015, Plaintiff declined to switch HIV medications, reporting that his symptoms were well controlled on his current medication. (*Id*., Tr. 934, PAGEID #: 980).

The record also documents Plaintiff's history of vision problems. Specifically, he has a history of retinal detachment within his right eye and underwent surgery in 2006 and 2008. (Doc. 7-7, Tr. 506, PAGEID #: 551). Following his surgeries, Plaintiff reported poor vision in his right

eye, and the record documents central loss of retinal tissue (*id*.) and macular scarring. (*Id*., Tr. 510, PAGEID #: 555). His visual acuity testing showed reduced visual acuity within the right eye and, as a result, he wears prescribed soft contact lenses. (*Id*., Tr. 499, PAGEID#: 544). In December 2014, Plaintiff underwent surgery to remove a cataract from his right eye. (Doc. 7-8, Tr. 813, PAGEID #: 859). He subsequently reported some residual cloudy vision and began taking Retasis for dry eye, which improved his symptoms. (*Id*., Tr. 821, PAGEID #: 867).

The record also documents Plaintiff's spinal degeneration diagnosis and spinal surgery. In 2014, Plaintiff showed normal strength, coordination, and no pronator drift. (*Id*., Tr. 801, PAGEID #: 847). He exhibited no joint abnormalities, regular pulses, no lower extremity edema, normal strength in the extremities, normal reflexes, and ambulated with a normal gait. (Doc. 7-7, Tr. 403–05, PAGEID #: 448–50). In early 2015, Plaintiff reported back and shoulder pain and was diagnosed with radiculopathy. (*Id*., Tr. 594, PAGEID #: 639). In August 2015, Plaintiff complained of numbness and back pain, and after a steroid injection to the shoulder, reported tailbone pain and pain in his upper legs. (Doc. 7-8, Tr. 944, PAGEID #: 990). He was diagnosed with left sided sciatica (*Id*., Tr. 950, PAGEID #: 996), and subsequent radiographic imaging showed multilevel degenerative disc disease, with facet arthrosis, some disc bulging, hypertrophy, and foraminal narrowing. (Doc. 7-7, Tr. 613, PAGEID #: 658; Doc. 7-8, Tr. 937–54; PAGEID #: 983–1000). In September 2015, Plaintiff showed mildly positive straight leg testing and a mildly antalgic gait. (*Id*., Tr. 970, PAGEID #: 1016). In October 2015, Plaintiff underwent spinal epidural injections. (*Id*., Tr. 634, PAGEID #: 679; Doc. 7-8, Tr. 973, PAGEID #: 1019; *id*., Tr. 989, PAGEID #: 1035).

In November 2015, physical therapy progress notes note Plaintiff's "hip pain," along with his back pain and muscle weakness as the "reasons for visit/call." (*Id*., Tr. 1023, PAGEID #:

1069).  Those notes also document Plaintiff's "hip measures," which received scores of "good,"

apart from his right hip abduction strength, right hip extension strength, left hip abduction strength,

and left hip extension strength, which received scores of "poor."  (*Id.*, Tr. 1024, PAGEID #: 1070).

In 2016, Plaintiff exhibited degenerative disc disease of the spine with retrolisthesis of the

lumbar spine.  (*Id.*, Tr. 1074, PAGEID #: 1120).  He demonstrated full range of motion to the

spine, without tenderness or spasm, and showed normal reflexes.  (*Id.*, Tr. 1078, PAGEID #: 1124).

In April 2016, Plaintiff reported increased back pain, and back testing showed marked epidural

lipomatosis and degenerative changes.  (Doc. 7-9, Tr. 1272, PAGEID #: 1319).  In July 2016,

Plaintiff underwent a posterior lumbar laminectomy/micro discectomy.  (*Id.*, Tr. 1287–88,

PAGEID #: 1334–35).  Post-surgery, Plaintiff reported residual back stiffness, but also reported

that he no longer experienced his preoperative pain.  (*Id.*, Tr. 1350, PAGEID #: 1397).  Further,

he stated that his leg pain had resolved.  (*Id.*).  In October 2016, however, Plaintiff complained of

intermittent low back pain, which worsened when resting on his stomach.  (*Id.*, Tr. 1355, PAGEID

#: 1402).  He reported that he was limited from exercising due to pain; however, he also stated that

short walks helped alleviate his symptoms.  (*Id.*).  His doctor then referred him to physical therapy.

(*Id.*, Tr. 1360, PAGEID #: 1407).  Plaintiff reported moderate difficulty with his aquatic exercises

but admitted to not performing his exercises at home as directed.  (*Id.*, Tr. 1366, PAGEID #: 1413).

Straight leg testing continued to be negative, and he could stand on both heels and toes

without problem.  (*Id.*, Tr. 1375, PAGEID #: 1422).  He also ambulated with a normal gait and

was able to perform a mini squat.  (*Id.*). Testing in December 2016 showed disc bulging without

significant impingement.  (*Id.*, Tr. 1398, PAGEID #: 1445).  Physical therapy treatment notes

from 2016 indicate Plaintiff experienced some success with goal achievement but that he

had not been compliant with his plan of care.  (*Id.*, Tr. 1419, PAGEID #: 1466).

As to his mental health, the record indicates that Plaintiff has a combination of mental health diagnoses. In May 2012, Plaintiff experienced increased depression and overdosed on Tylenol in a suicide attempt. (Doc. 7-7, Tr. 339, PAGEID #: 384). He reported increased situational stressors, most significantly, his mother's hospitalization and dementia. (*Id*.). Plaintiff was referred to mental health services for medication and counseling. (*Id*., Tr. 340–41, PAGEID #: 385–86). After ten days on medication, Plaintiff showed an increase in his GAF score. (*Id*., Tr. 341, PAGEID #: 387). He reported intermittent sleep due to fleeting suicidal ideations and was offered sleep medications, which he declined. (*Id*., Tr. 345, PAGEID #: 390). Further, he reported stress, but stated that with medication, he felt no suicidal or homicidal ideations, had no hallucinations, and experienced no paranoid ideations. (*Id*., Tr. 347, PAGEID #: 392).

In 2013, Plaintiff reported some breakthrough symptoms of irritability, anger, and monthly panic attacks. (*Id*., Tr. 367, PAGEID #: 412). He stated that his symptoms occurred with stress from caring for his mother and the fact that his siblings did not assist with her care. (*Id*., Tr. 367, PAGEID #: 412). Plaintiff increased his dose of Celexa and subsequently reported feeling better with reduced stress. (*Id*., Tr. 383, PAGEID #: 428). In 2014, Plaintiff indicated that he was planning a trip and noted that he felt more calm and stable when taking his prescribed medications. (*Id*., Tr. 387, PAGEID #: 432). He continued to report situational stressors concerning his mother and siblings. (*Id*., Tr. 461, PAGEID #: 596; *id*., Tr. 473, PAGEID #: 518).

In 2015, Plaintiff's counselor advised him on taking his medications as prescribed and discussed a treatment plan, which involved setting goals and taking medications to achieve those goals. (*Id*., Tr. 607–08, PAGEID #: 652–53). Plaintiff reported that his depressive symptoms still existed but that they were generally stable and slowly improving. (Doc. 7-8, Tr. 922, PAGEID #: 968). During his treatment sessions, Plaintiff explained that he was bored in Ohio, missed

traveling, and felt happiest when he was living in Washington D.C. (Doc. 7-7, Tr. 698, PAGEID #: 743; *id*., Tr. 716, PAGEID #: 761). He stated that he felt stuck caring for his mother (*id*., Tr. 698, PAGEID #: 743), but that he wanted to continue to care for her until she passed away and would then move to another city to better care for himself. (*Id*., Tr. 692, PAGEID #: 737).

In 2016, Plaintiff was able to care for himself, but reported that he was easily agitated. (*Id*., Tr. 680, PAGEID #: 725). He again referenced his stress stemming from his role as his mother's primary caregiver. (*Id*., Tr. 684, PAGEID #: 729). In the spring of 2016, Plaintiff reported that despite his stressors, he was able to reach out for help when he needed it. (Doc. 7-9, Tr. 1311, PAGEID #: 358). He further noted that his depression was not constant, but rather intermittent, and indicated there were some on and off days of both happiness and depression. (*Id*., Tr. 1310, PAGEID #: 357). In the fall of 2016, Plaintiff reported a slightly low mood, but reported that medication compliance allowed him to sleep better. (*Id*., Tr. 1334, PAGEID #: 381). He reported some passive suicidal ideations but stated that he had no plan or intention to harm himself. (*Id*.). By December 2016, Plaintiff reported some residual symptoms of depression and holiday-related stress but maintained that he had no suicidal or homicidal ideations and reported sleeping 6-7 hours at night. (*Id*., Tr. 1344, PAGEID #: 1391).

### D. The ALJ's Decision

The ALJ found that Plaintiff remained insured for disability insurance benefits through March 31, 2015 and that he had not engaged in substantial gainful activity since his alleged onset date of February 15, 2012. (Doc. 7-2, Tr. 17, PAGEID #: 57). The ALJ determined that Plaintiff suffered from the following severe impairments: loss of vision in the right eye, degeneration of the spine, HIV positive, depressive disorder, bipolar disorder, borderline personality disorder, and a history of posttraumatic stress disorder. (*Id*., Tr. 18, PAGEID #: 58). Additionally, the ALJ

determined that Plaintiff suffered from non-severe impairments, including left shoulder degeneration, history of bunion to the right foot, history of tension headaches, history of hyperlipidemia, and history of urinary tract infections. (*Id.*).

Upon consideration of the record, the ALJ determined that Plaintiff retained the following residual functional capacity ("RFC") to:

> perform light work … except the claimant could occasionally stoop. He should avoid workplace hazards, including unprotected heights and machinery. The claimant would be precluded from commercial driving. He could perform simple, routine, repetitive tasks, involving only simple work related decisions and with few, if any, workplace changes, in a setting with no strict production quotas or fast pace work, such as on an assembly line. Further, the claimant could have occasional interaction with the general public, coworkers, and supervisors.

(*Id.*, Tr. 21, PAGEID #: 61).

As to Plaintiff's shoulder pain, the ALJ detailed the medical records concerning Plaintiff's shoulder issues. (*Id.*, Tr. 18, PAGEID #: 58.). The ALJ noted that, based on the records, Plaintiff was "doing well," but that his symptoms worsened after shoveling snow. (*Id.*). He also stated that "[w]ith physical therapy, the record supported symptom improvement and with increased strength and decreased pain, the claimant was discharged from physical therapy and provided a home exercise program." (*Id.*). Further, the ALJ noted that Plaintiff "testified that the cortisone joint injection to the left shoulder resolved his left shoulder symptoms and he experienced no other residual symptomology." (*Id.*).

The ALJ held, however, that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*, Tr. 19, PAGEID #: 59). Specifically, the ALJ found that Plaintiff had a moderate limitation in interacting with others; moderate limitations with regard to concentrating, persisting, or maintaining pace; and moderate

limitations in adapting or managing himself.  (*Id.*, Tr. 20, PAGEID #: 60).  As to Plaintiff's mental health, the ALJ noted the following:

> The record supports he manages his own medical care and medications.  While he requires medications, the records document with medications he showed no aberrant or bizarre behaviors and was able to communicate appropriately with his treatment providers, attorney, and the undersigned during his hearing.  The record supports he does have some difficulty with frustration tolerance and situational stressors, especially those surrounding familial affairs.

(*Id.*).

After describing Plaintiff's various physical and mental health issues, the ALJ concluded, "after careful consideration of the evidence," that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*, Tr. 23, PAGEID #: 63).

The ALJ explained that "[t]he objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity as to preclude the functional abilities described above."  (*Id.*, Tr. 28, PAGEID #: 68).  Moreover, he found that "[i]n addition to the general lack of objective evidence, the evidence of record does not support his subjective complaints."  (*Id.*).  The ALJ elaborated on this opinion:

> The claimant reported he was unable to engage in work related activities as a result of his combination of his conditions; however, the record documents, in 2016, after his back surgery, the claimant reportedly was considering returning to work.  This suggests the claimant believed he was able to engage in work related activities.  Treatment records noted the claimant missed traveling and was 'bored' in Ohio.

(*Id.*) (internal citations omitted).

Specifically, the ALJ found that Plaintiff's activities were "not restricted to the extent that he would be precluded from the range of work assessed herein." He explained his conclusion as follows:

> It should be noted in October 2014, the claimant reported his mother completed all of the cooking and cleaning and his fatigue related to HIV prevented him from doing anything. However, the record documents the claimant was capable of engaging in more physical activities than he initially reported. In November 2015, the claimant indicated he was responsible for caring for his elderly mother, who was diagnosed with dementia. He reported he was responsible for household chores, mowing the lawn, and going to various scheduled appointments. While he testified that he and his mother helped each other out, the record supports that the claimant referred to himself as his mother's caretaker, as she had dementia, suggesting he was responsible for all of her care, as he referred to caring for her as stressing and overwhelming. He indicated he felt as if he was his mother's servant. While he testified he did not care for any outside chores, the record supports the claimant felt shoulder pain after shoveling snow, suggesting he was capable of some outside chore activities. The record supported no limitation in self-care, including dressing or caring for personal hygiene. He indicated he could drive, but chose not to. While he opted not to drive, the claimant remained able to use public transportation, as he used the bus to get to his disability hearing. During the period of time he alleged he was disabled, the record supports the claimant [sic] enjoyed traveling and was planning a subsequent trip during 2014. Further, the record suggests the claimant may have been enrolled in school during 2015, as he requested a school excuse after receiving medical treatment.

(*Id.*, Tr. 28–29, PAGEID #: 68–69).

Moreover, the ALJ found that the record contained inconsistent statements. (*Id.*, Tr. 29, PAGEID #: 69). For example, the ALJ noted inconsistencies regarding Plaintiff's statements concerning his physical and mental capabilities and records indicating that he was able to plan vacations and travel. (*Id.*). Similarly, the ALJ found Plaintiff's statement that he had no hobbies to be inconsistent with the record, which noted he was interested in photography and enjoyed jogging when able. (*Id.*). Furthermore, he found Plaintiff's testimony regarding his suicidal tendencies inconsistent with reports from the record. (*Id.*, Tr. 30, PAGEID #: 70). The ALJ also noted Plaintiff's documented non-compliance with his mental health medications, instructions

regarding his contact lens, and prescribed physical therapy exercises. (*Id.*). In sum, he concluded that "[a]lthough the information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless such statements suggest that the information provided by the claimant is not generally supported by the evidentiary record." (*Id.*, Tr. 31, PAGEID #: 71).

As for the opinion evidence, the ALJ assigned GAF scores associated with moderate symptomology "the most weight" of all the GAF scores. (*Id.*). He assigned "some weight" to the postoperative restrictions provided by Dr. Kuennen, in December 2014, as they were most relevant at the time they were assessed. (*Id.*). Next, the ALJ assigned "little weight" to the functional statements regarding Plaintiff's "perceived pre-therapy functional capacity" and his "predicted functional capacity after therapy treatment." (*Id.*). In doing so, the ALJ noted that he found the statements "were subjectively reported by the claimant and not based on objective testing and speculatively reported by the treating provider, not based upon physical performance." (*Id.*, Tr. 31–32, PAGEID #: 71–72).

Next, the ALJ assigned "some weight" to Plaintiff's September 2015 functional assessment. (*Id.*, Tr. 32, PAGEID #: 72). Specifically, he gave greater weight to "the lack of limitation in short durational walking and transitioning, as such activities are consistent with the claimant's normal routinely reported activities." (*Id.*). However, he assigned less weight to the "postural preclusions," as he found that Plaintiff "would have some limits on stooping and exposure to hazards but would not be precluded from engaging in other activities, as testing showed normal lower extremity strength and an ability to engage in squatting, as well as heel and toe walking without a problem." (*Id.*). Further, the ALJ assigned "some weight" to the postsurgical September 2016 functional assessment because the physician's assistant "was familiar with [Plaintiff's] surgical intervention and recovery care and treatment." (*Id.*). Finally, the ALJ

assigned "some weight" to the State Agency's consultants' assessments. (*Id.*). He assigned them "some weight" because since the prior ALJ's decision, the ALJ found that "the record supports additional conditions, including spinal degeneration, requiring a spinal surgery, which requires a more restrictive residual functional capacity with postural and environmental limitations, such as the reduced range of light exertional level work outlined[.]" (*Id.*).

## II.   STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.   DISCUSSION

Plaintiff asserts three assignments of error: (1) that the ALJ failed to address the opinions of physical therapist Mr. Eakins; (2) that the ALJ improperly assessed and characterized his shoulder and hip conditions; and (3) that the evidence of record documents a finding of automatic disability. (*See generally* Docs. 10, 12).

## A. Mr. Eakins' Opinions

In his first statement of error, Plaintiff argues that the ALJ did not "evaluate," "acknowledge," or "consider" the opinions of physical therapist Mr. Eakins. (*Id.* at 6–7). Specifically, Plaintiff argues that "[b]ased on Social Security's own rules and regulations, Mr. Eakins' findings could have been entitled to great weight" and that "[h]is opinions could have had an impact on the residual functional capacity." (*Id.*). Plaintiff contends that while the ALJ "was not required to accept or adopt Mr. Eakins' findings, he was required to consider them and weigh their value," and that the ALJ's "failure to do so creates reversible error." (*Id.* at 7).

As an initial matter, Plaintiff acknowledges that Mr. Eakins, a physical therapist, is not an acceptable medical source. (*Id.* at 6). Further, contrary to Plaintiff's suggestion otherwise, there is no requirement that the ALJ's opinion specifically reference Mr. Eakins by name. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (holding that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). Moreover, while Plaintiff attempts to hold the ALJ to a higher burden regarding his assessment of Mr. Eakins' opinion, there is no "reasons-giving" requirement with regards to non-treating sources. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 225, 259 (6th Cir. 2016), *reh'g denied* (Sept. 20, 2016).

Further, it is clear from his written opinion, that the ALJ directly addressed and evaluated Mr. Eakins' physical therapy notes. (*See, e.g.*, Doc. 7-2, Tr. 25, PAGIED #: 65 ("the claimant was referred to physical therapy. The claimant reported moderate difficulty with his aquatic exercises and he admitted he was not performing his exercises at home as instructed." (citing Mr. Eakins' progress notes at Doc. 7-9, Tr. 1365, PAGEID #: 1413)); *id.* ("Additionally, physical therapy treatment notes showed the claimant received some success as some of his goals were achieved."

(citing Mr. Eakins' progress notes at Doc. 7-9, Tr. 1419, PAGEID #: 1466)); *id.* ("A month later . . . the claimant reported intermittent low back pain, worse when laying on his stomach." (citing Mr. Eakins' progress notes at Doc. 7-9, Tr. 1355, PAGEID #: 1402)); *id.* (noting that straight leg testing remained negative (citing Mr. Eakins' progress notes at Doc. 7-9, 1358, PAGEID #: 1405))). The foregoing makes clear that, contrary to Plaintiff's argument, the ALJ—not the Commissioner as Plaintiff argues—evaluated Mr. Eakins' opinions. (*See* Doc. 12 at 3).

Plaintiff additionally argues that the ALJ "could" have assigned Mr. Eakins' opinion great weight and, in turn, drafted a more restrictive RFC. (*See* Doc. 10 at 6–7). But Plaintiff overlooks the fact that the ALJ's discussion of the physical therapy notes, in the context of his analysis of the record, demonstrates that the ALJ found Mr. Eakins' physical limitations not only inconsistent with the record evidence, but also internally inconsistent. Indeed, the ALJ specifically cites Mr. Eakins' progress notes regarding Plaintiff's improvement and the fact that Plaintiff did not perform his at-home exercises as instructed. (*See supra* at 14–15). Therefore, even if the ALJ could have been more clear about Mr. Eakins' opinions, any failure to do so is harmless. The ALJ's analysis of Mr. Eakins' notes, in conjunction with the ALJ's evaluation of the record as a whole, demonstrates that the ALJ was not required to assign Mr. Eakins great weight (*see* 20 C.F.R. § 404.1527(c)(4) (consistency of opinion with the record evidence is a factor in weighing opinion evidence)), nor was he required to draft a more restrictive RFC for Plaintiff. As such, Plaintiff has failed to demonstrate reversible error.

### B. Shoulder and Hip Impairments

#### 1. *Shoulder Impairment*

Plaintiff next argues that the ALJ erred in finding his shoulder impairment "non-severe" and in classifying his hip condition "as not a medically determinable impairment." (*See* Doc. 10

at 7–9).  Concerning his left shoulder, Plaintiff contends that the ALJ committed reversible error in determining that his shoulder condition was not "severe" at step two in his analysis.  (*Id*. at 8).  Specifically, Plaintiff argues that "medical evidence of record documents the severity of [his] left shoulder issues, and yet the ALJ completely omitted any limitations regarding the left shoulder." (*Id*.).

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal quotation marks and citation omitted), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  *See* Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996).  Because the regulations require an ALJ to consider both severe and non-severe impairments in the remaining steps of the disability determination analysis, once a severe impairment is found, all impairments, regardless of how they are classified, will be analyzed in the ALJ's determination.  *See Dyer v. Colvin*, No. CV-14-156-DLB, 2016 WL 1077906, at *3 (E.D. Ky. Mar. 17, 2016).  "For this reason, the Sixth Circuit has consistently held that an ALJ does not commit reversible error when he or she decides that some of claimant's impairments are not severe, but finds that other impairments are severe and proceeds with his or her analysis."  *Id.*

In this case, the issue is not whether this Court would come out differently on the severity determination, but whether substantial evidence supports the ALJ's finding.  *See Reed v. Colvin*, No. CIV. 13-54-GFVT, 2014 WL 318569, at *3 (E.D. Ky. Jan. 29, 2014) ("The limited nature of substantial evidence review prevents the reviewing court from substituting its judgment for that of the ALJ.").  Here, the undersigned finds that substantial evidence supports the ALJ's classification of Plaintiff's shoulder condition as non-severe.

To start, the ALJ provided a detailed discussion of Plaintiff's history concerning his left shoulder:

> The claimant reported, in 2015, that he experienced left shoulder pain . . . In March 2015, the claimant reported tingling into the arm and pain with lifting the arm. The claimant was prescribed Meloxicam and was referred to physical therapy. The claimant's symptoms remained stable. Despite a frozen shoulder diagnosis, the claimant showed no tenderness to palpation, and evidenced only some reduced range of motion and reduced strength. The claimant was doing well, but indicated after shoveling snow his symptoms worsened. With physical therapy, the record supported symptom improvement and with increased strength and decreased pain, the claimant was discharged from physical therapy and provided a home exercise program. After being released from therapy, the claimant reported some intermittent joint pain with maintained strength and range of motion. Further testing evidenced a partial thickness tear to the tendon with osteoarthritis to the AC joint and in August 2015, the claimant received a left shoulder joint injection. The claimant testified that the cortisone joint injection to the left shoulder resolved his left shoulder symptoms and he experienced no other residual symptomology.

(Doc. 7-2, Tr. 18, PAGEID #: 58) (internal citations omitted). The ALJ concluded, based on a thorough review of the medical records, that Plaintiff's shoulder condition was not severe within the meaning of the regulations. (*Id*., Tr. 19, PAGEID #: 59). Notably, and as pointed out by the ALJ, Plaintiff's own statements undermine his allegations concerning the severity of his shoulder impairment. (*Id*., Tr. 18, PAGEID #: 58). Indeed, the ALJ specifically asked Plaintiff about his shoulder issues:

> Q. . . . the left shoulder, problems with your left shoulder?
> A. No.
> Q. No? At one time did you have problems with your left shoulder?
> A. Yeah, I did.
> Q. Okay.
> A. I had problems with it, and they kind of corrected that with a cortisone shot.
> Q. Okay. So that's resolved?
> A. Yes.
> Q. Okay.

(Doc. 7-2, Tr. 92–93, PAGEID #: 132–33). In light of the above, the undersigned finds that substantial evidence supports the ALJ's assessment of Plaintiff's shoulder impairment. The record

as a whole fails to demonstrate that Plaintiff's shoulder impairment significantly limited his ability to perform basic work activities or caused functional limitations. *See* 20 C.F.R. S 404.1521(b) (basic work activities are the ability and aptitude necessary to do most jobs). As discussed thoroughly by the ALJ, both the record and Plaintiff's own testimony indicate that Plaintiff's shoulder symptoms had resolved. (Doc. 7-2, Tr. 18, PAGEID #: 58).

In any event, the ALJ's characterization of Plaintiff's shoulder as non-severe is inconsequential to his ultimate decision. The ALJ did not "screen out" Plaintiff's claim by denying it at step two. *Farris*, 773 F.2d at 89. Instead, the ALJ found that Plaintiff had multiple severe impairments and properly proceeded to the next steps of the disability evaluation process. In other words, "[b]ecause the ALJ found that [Plaintiff] had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). Plaintiff contends that "it is not clear that the ALJ considered" his shoulder impairment beyond step two. (Doc. 12 at 3–4). Yet, when formulating the RFC, the ALJ noted that Plaintiff "endorsed a history of left shoulder problems, but reported the problems no longer exist." (Doc. 7-2, Tr. 22, PAGEID #: 62). Therefore, the ALJ did not commit reversible error; rather, he identified other severe impairments, proceeded to the remaining steps of the Five-Step sequential evaluation process, and properly considered both severe and non-severe impairments when formulating the RFC.

### 2. *Hip Impairment*

As a threshold matter, "'[t]he burden lies with the claimant to prove that [he] is disabled.'" *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 903 (E.D. Mich. 2014) (quoting *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010)). Indeed, "'[t]hrough step four, the

claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work.'" *Id*. (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)). Here, Plaintiff never testified to a hip impairment or otherwise expressly alerted the ALJ to such an impairment. Now, however, Plaintiff contends that the ALJ's "failure to consider this impairment leaves the residual functional capacity as an inaccurate depiction of [his] capabilities as it does not account for the impact of [his] hip condition." (Doc. 10 at 9).

In support of this argument, Plaintiff relies on a handful of records that document his bilateral hip condition. (*See id.*). These records include physical therapist's progress notes, which indicate that Plaintiff visited the physical therapist because of his complaints of hip pain, as well as back pain and muscle weakness. (*Id*., Tr. 1023, PAGEID #: 1069). The notes also document Plaintiff's "hip measures," which received scores of "good," apart from his right hip abduction strength, right hip extension strength, left hip abduction strength, and left hip extension strength, which received scores of "poor." (*Id*., Tr. 1024, PAGEID #: 1070). The undersigned notes that the ALJ cited these records (*See id*., Tr. 24, PAGEID #: 64 (citing B16F)), and accordingly presumes that the ALJ properly considered them. *See Bailey v. Comm'r*, 413 F. App'x 853, 856 (6th Cir. 2011) (noting the presumption that ALJs "carry out their duties fairly and impartially").

Also important, the ALJ expressly analyzed the ways in which Plaintiff now asserts that his hip condition impairs him. (Doc. 10 at 9 (asserting that that his hip impairment affects his "joint integrity, mobility, body mechanics, muscle performance, range of motion, gait, and balance")). The ALJ thoroughly considered Plaintiff's joint integrity, mobility, body mechanics, muscle performance, range of motion, gait, and balance. (*See, e.g.*, Doc. 7-2, Tr. 24, PAGEID #: 64 ("During 2014, the claimant showed normal strength"); *id*. ("He exhibited no joint

abnormalities . . . normal strength in the extremities, normal reflexes, and ambulated with a normal gait"); *id.*, Tr. 25, PAGEID #: 65 ("During 2016 . . . [s]traight leg testing was negative and he ambulated with a normal gait and strength, with normal heel and toe walking"); *id.* ("Post operatively . . . [h]e indicated that his pain was well controlled and he was ambulating without any assistive device in September 2016. He indicated his leg pain had *resolved*") (emphasis in original); *id.* ("While he reported he was limited from exercising due to pain, he admitted short walks alleviated his symptoms. . . . Straight leg testing continued to be negative and the claimant could stand on both his heels and toes without problem. The claimant ambulated with a *normal* gait and was even able to perform a mini squat.") (emphasis in original); *id.*, Tr. 26, PAGEID #: 66 ("It should be noted, while the claimant reported difficulty walking at the hearing, requiring the use of a cane, due to balance instability, the record does not objectively document any noted balance deficits or ambulation instability. . . The record does not indicate the claimant showed any instability in his gait or station and does not find there was any medically necessary ambulatory aid as he ambulated with a normal gait without the use of any assistive device during his treatment sessions.").

It is true that in considering these records, the ALJ focused on Plaintiff's back impairment, but that was to be expected because Plaintiff testified that his "biggest thing" is his back because it "limit[s] [him] to a good way of life because [he is] always in constant pain with [his] back." (*Id.*, Tr. 98, PAGEID #: 138). Relevant here, an ALJ may analyze certain evidence in the context of other evidence. *See Trammell v. Comm'r*, No. 1:13CV794, 2015 WL 1020211, at *10 (S.D. Ohio Mar. 9, 2015) (noting that it was "understandable" that the ALJ viewed evidence through a certain lens). In this case, it is clear from the ALJ's opinion that he carefully considered the records

and the disabling effects Plaintiff now asserts, and the ALJ "provided sufficient discussion for this Court to review, understand, and affirm his decision as supported by substantial evidence." *Id.*

In sum, the undersigned concludes that the ALJ sufficiently accounted for the issues Plaintiff cites, *i.e.*, his gait, muscle joint integrity, mobility, body mechanics, muscle performance, range of motion, and balance; and, consequently, the ALJ did not commit reversible err.

### 3. The ALJ's RFC Assessment

Finally, Plaintiff argues that had the ALJ limited him to "sedentary work," he would be considered disabled under the Medical-Vocational Guidelines upon reaching the age of 50. (Doc. 10 at 10). Plaintiff contends that the evidence "documents that [he] can, at best, perform at the sedentary level," and that that the evidence "documents greater functional restrictions than accounted for by the ALJ's residual functional capacity." (*Id.*). Specifically, Plaintiff asserts that he "suffers from additional problems with both his left upper extremity and his bilateral hips that would further diminish the residual functional capacity" and that those impairments would "more than minimally impact" his ability to perform work related activities. (*Id.*). In support, Plaintiff notes evidence of lumbar spinal issues, limited range of motion, positive straight leg raise tests, and neural foraminal narrowing. (*Id*). At base, Plaintiff asserts that the ALJ's RFC is not supported by the medical evidence in the record.

Here, the undersigned concludes that the ALJ reasonably relied on the medical evidence and the VE's testimony in formulating Plaintiff's RFC. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's

residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Substantial evidence supports the ALJ's RFC limiting Plaintiff to a range of "light work." The ability to perform light work is defined generally as lifting or carrying ten pounds frequently, but no more than twenty pounds, and requires "a good deal of walking or standing" or sitting with some pushing and pulling. 20 C.F.R. § 404.1567. The ALJ reached his conclusion that Plaintiff was capable of light work, with some added restrictions, based on his review of the record, the VE's testimony, Plaintiff's testimony, and the medical record evidence.

To start, the ALJ appropriately relied on the VE's testimony that Plaintiff could perform his past relevant work as a commercial cleaner, as it was actually performed, at the light exertional level. (Doc. 7-1, Tr. 33, PAGEID #: 73). Under 20 C.F.R. § 404.1520(e), a claimant will be considered "not disabled" where he retains the RFC to perform his past relevant work either as he actually performed it or as it is performed in the national economy. Even so, the ALJ made an alternative finding based on the VE's testimony that Plaintiff could perform other work such as a label coder, routing clerk, and tacking machine tender. (*Id.*, Tr. 34, PAGEID #: 74). Under 20 C.F.R. § 404.1566(e), an ALJ may use the services of a vocational expert when determining

whether other work exists in the national economy.  *See also Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2011) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments.").  Therefore, the ALJ properly relied on the VE's testimony, Plaintiff's testimony, and the medical records in formulating the RFC.

While Plaintiff may disagree with the ALJ's decision regarding his ability to perform "light" rather than "sedentary" work, he has not shown that it was outside the ALJ's permissible "zone of choice" that grants the ALJ discretion to make findings without "interference by courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).  Plaintiff is correct that the record contains evidence potentially cutting against the ALJ's conclusion.  But the question at this stage is whether substantial evidence supports the ALJ's severity finding, and it does.  *See Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, [courts must] defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." (internal quotation marks omitted)).  Taken together, the evidence of record and the evidence the ALJ relied on is "more than a scintilla of evidence" that "a reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241 (internal quotation marks omitted).  This meets the substantial-evidence bar and ends the undersigned's review of the matter.

## IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   October 17, 2018                          /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE